Company. Mr. Marku. Thank you, Your Honor. May it please the Court, Aaron Marku for Petitioners Appellants, Cross Appellees, Esso, and Shell. In Temex, this Court held that an old arbitration award should be enforced if recognizing a foreign judgment under the annulling the award would be repugnant to fundamental notions of decency and justice in the United States. This is one of those unusual cases that satisfies the high standard that the Court established in Temex. In two highly irregular and unprecedented decisions, the Nigerian Court of Appeals substantially reinstated our annulled arbitration award. An award that found that NNPC had breached our contract by forcing us to hand over huge quantities of oil to which NNPC was not entitled and thus cost us billions of dollars in damage. But then the Court held that we could not recover any compensation for our injuries. In essence, the Nigerian courts have held that we win on everything except getting paid by NNPC. And NNPC loses on everything except having to pay us for the oil we took. The effect of these and other decisions by the Nigerian courts is that we have no forum where we can recover damages except this one. Those decisions by the Nigerian courts sanctioned the evisceration of our contract rights, denied us a basic due process, and thereby offended fundamental notions of justice in the United States. On those facts, Your Honors, we submit that we satisfy the Temex standards. Justice in Temex, there are four powerful considerations here that support a decision by this court to deny comity to the Nigerian decisions. They're not exactly the same considerations as in Temex, but they satisfy the Temex standards. The Temex standard focuses on justice. It, we submit, is not a checklist. The four considerations that justify enforcing our award and denying comity to the Nigerian decisions are, one, a holding that NNPC is liable but need not pay any damages. Two, an evisceration of our contractual rights, both our substantive rights and our rights to arbitration. Three, we have no forum in Nigeria in which to seek compensation for NNPC breaches. And four, the decisions were based on a retroactive application of the law. Mr. Marcu, let's assume that we agree with you that the district court misapplied Temex. It treated it almost as though it was statute setting forth specific rules rather than applying the general rule having to do with what's decent and just. Let's assume we agree with you on that. Now, the question then is what do we do if we do? And I ask that partly in relation to your brief, which mentions once or twice the notion of the possibility of reversal or remand. Now, just supposing that we agree with you that Temex was not properly applied here. Do we then remand? And if we do remand, what do we remand for? How do we instruct the district court? Again, assuming all of this. Your Honor, the possibility of reversing remand is certainly one of the things that we are seeking in the alternative. Of course, we think that the court can enforce the award and deny comedy to the Nigerian decision based on the substantial record that we provided to the district court, which unfortunately was not considered in the decision making below. If the court were to reverse and remand, though, we would ask for a remand directing the district court to permit discovery on the merits because the court had promised us discovery on the merits if we established jurisdiction and further proceedings to present evidence to the district court on the issues and the merits. These, I think, are naturally important things for the court to consider below if the court were to remand because our case is all about issues that arose outside of the arbitral record, and so therefore evidence needs to be provided to establish our burden of meeting the Temex standard. That would be our first request. Alternatively, the court could remand with instructions to stay the case pending final decisions of all the Nigerian litigations. I gather that is it established that that would take a decade or more? I mean, do we know that as a fact? Certainly, both parties made that point, including NNPC below your honor, that it could take a decade or longer before those decisions are all final. That is, for us, it would be a far less attractive alternative, but certainly better than the dismissal of our petition, which would basically foreclose for us the last forum we've got because the statute of limitations would not permit us to come back under the convention. So our preference at the court is not of a mind to review the record below and enforce the award than it is to remand for additional discovery and for the presentation of evidence to the district court. Can I ask about that? You submitted some affidavits in connection with the proceedings below already, and it seems like these are supposed to be summary proceedings where you make a motion. It seems like in the D.C. circuit, at least, there's been the practice of considering affidavits and similar submissions that were filed. So I guess I'm wondering why, given that these are summary proceedings and you've already submitted a bunch of affidavits and materials, what authority do you have for the idea that there should be further discovery? Well, I would point to two things, Jeff Kohner. First, the district court had told us in the parties' work of the understanding that we would be able to get discovery on the merits so we could attempt to establish to the court's satisfaction that the Nigerian courts, for example, were bending to the will of the executive in issuing the bizarre and unjust decisions that they issued because that's what they do when they are adjudicating a case for an N.P.C. in which damages are sought from an N.P.C. And we established or we presented a larger volume of evidence and high-quality evidence to confirm that. So there was an understanding. It was what the parties had discussed. It was discussed in conferences. And even at the argument of the motion, Judge Pauly said that if we establish a penaltation case, we would then be able to proceed with discovery on the merits. And the N.N.P.C.'s counsel agreed. My friend from N.N.P.C. agreed with that at argument. And what would that be? I mean, because you've already made submissions of affidavits. What are you contemplating discovery would look like? We would like to take additional discovery to get some additional documents from N.N.P.C. with respect to the litigations that they have been engaged in in Nigeria against foreign companies. We'd like to cross-examine their expert who has said publicly in various forums in Nigeria that the Nigerian courts surrender their judicial independence in big cases in which they're highly high-profile and involve a lot of money. And that's my timer going on. That's OK. You should feel free to excuse me. This is Judge Carney. You should feel free to go ahead here. And I will, Ms. Moss, enlarge your time as well to respond to make sure you're both on equal footing. Thank you, Your Honor. And I also would like to point out to two. Well, I'm sorry to finish the previous answer. We would like an opportunity to present the evidence to to to the district court, because somehow in the in the passage of time with something else, the understanding that this would be a two part procedure in which first we would establish jurisdiction and then we would proceed with merits discovery to to to establish our underlying allegations got lost. And that was what we anticipated. We the judge said in in conferences that we would have that opportunity. But we couldn't do that until we established jurisdiction. We succeeded in establishing jurisdiction on multiple on two theories. And we would have expected that the next stage would have been to set a schedule for discovery. But somehow that just fell out of the equation without any explanation in the in the district court. And I would also add that. Yes. That's OK. Why don't you finish your your statement and then I'll ask a question going down a somewhat different path. Thank you, Your Honor. Just one sentence. This court in Pemex and in Ty Lowe did permitted the taking of discovery and notary hearing below after after remand, which I think is not unusual in this circuit. And I wrote I would also. Well, I'll then I'll stop there for this question. Thank you. So if we were to disagree with you that under Pemex, we are and you are entitled to simply disregard the Nigerian courts current decision. But we were to look and try to take what could be taken from that decision, which seemed to be, as I read it anyway, acknowledging that a portion of the dispute was related to tax matters as to which the arbitral panel did not have jurisdiction. But another portion in which you were vindicated was based on the contractual agreement and that those are severable and awardable by the arbitral tribunal. Is there any basis in the record for allocating the one point eight billion between those two elements that is already established? I read your papers now to urge that the district court exercising, you know, in the aim of justice, exercising its inherent authority, simply award the one point eight billion without regard to the segregation that was proposed in the district court in the Nigerian court. But if we were to follow the Nigerian court's lead on this and validate the contractual findings of the panel, is there any basis in a relatively summary proceeding for an award to be made on remand? I believe I do. I think the I would start with the with the decisions by the Nigerian court, which we, I appreciate your attempting to dissect it to to see if parts can be preserved and parts not. Or parts and parts and parts not. I think it'd be very difficult, especially given the evidence we've submitted relating to the to the lack of impartiality of the Nigerian courts. I really want you to focus. I want you to focus just on the damages portion. You've argued for all or nothing kind of position that you should have the benefit of the full arbitral award of one point eight billion as amplified over the years with interest and so on. But I'm interested in knowing whether in maybe documents that aren't in the record that I've missed in the record, the award was calculated in such a way as to identify a portion that is tied to contractual damages as opposed to tax related damages. Is there something like that that gives a dollar figure in the record? There is your honor. I think it's not divided between contractual and and other or not, or, or tax tax dispute issues because that's not the way the arbitration panel decided it. It's found that everything was contractual, but there are there are multiple kinds of damages that were awarded by the, by the arbitral tribunal, which and that is all in the record of the tax portion of the one point eight billion was approximately one point five. Five billion, but again, that was a contractual. Those were contractual damages awarded by the arbitration panel. And I appreciate what you're asking me, so I won't argue that point at the moment. The other three hundred million approximately were damages that were related to other oil that Nigeria extorted from us or forced us to give it. Forced us to give it without any without basis in the contract, and the Nigerian courts did not distinguish at all between tax oil royalty oil, which is one of the others and cost oil, which was what we could what we were entitled to recover our costs for the six billion dollars. We invested in in developing the entire oil. They swept away the entire one point eight billion in one fell swoop, which we believe is not only a regular, but it helps to it helps to confirm that this was not a normal judicial decision. Red flags should should be flying when when fair minded judges read those opinions because they don't make sense. They're designed to find I submit a preordained result that NNPC will not have to pay damages. The decision by the but but so I'm sorry, I don't want to confine myself to your question. Yes. Yeah, I would just like you to. So what I'm hearing is that you it's it's the the premise is too counterfactual for you and that really there's no. I mean, there are discussions of figures in the arbitral award, but they were all tied to contractual damages. And so you can't really point to anything that would be enforceable by the district court if if we were to, you know, try to divide up and give comedy to just one portion of the. I think it was around, I would just point to the 300 million dollars that was for loyalty and cost. Well, so I think, you know, there there is there is a conceptual way, I suppose, but obviously one that we that is not our preferred result, let's say. Yeah, let me ask you one. Could you go ahead? No, no. OK. I gather it's so and shell are before us now. They're referred to as a single party, but it's two different companies, one UK, one one US. Is that right? I mean, they're subsidiaries of their Nigerian subsidiaries. And. And those those are the those are the companies that are before us. That's right, isn't it? Well, the two the two parties, the technical parties, the subs, your honor, the Nigerian sub. Right. Right. The real parties in interest are the parents in the US company and shell, which I believe is headquartered in in Holland. But but in not in the United States. OK, either way. But I was wondering, I get the sense out of this these piles of documents. I get the sense that is your position that doing business with oil business with Nigeria leads to has a history of leading to the kind of. Behavior of which you're complaining, it's not just you, it's happened over and over again, which is part of the reason why we are supposed to or we argue that we wish we should not uphold. We should not give credence to the to the Nigerian courts. Now, has this happened to many other companies as well as Shell and Exxon and their subsidiaries? Your honor, we have reviewed all of the case law going back 20 years. And NPC has a perfect 13 and no record against foreign owned plaintiffs in Nigerian courts in which money damages are sought. It has no record, perfect record in in cases for the enforcement of arbitral awards for money damages before the Nigerian courts. And there are other cases like this one involving the oil, international oil companies. Those are not all oil company cases that I just referred to. But there are there are other oil company cases that are. If this is a quick follow up, what I'm getting at is how come just two of those cases are before just two of those plaintiffs, the Shell and Shell, the Shell plaintiffs and the Exxon plaintiffs are before. What happened to the others? Was there a follow up litigation, follow up attempts to to overcome the Nigerian decisions that you're signing? Some of the of the adverse decisions annulling arbitration awards, your honor, were were taken to the Nigerian courts and those arbitration awards were annulled in one or two cases. I believe there are stays in place, but we just happen to be the lucky ones to be first out of the out of the gate. So we were the first ones to to challenge what we regard as the the unjust decision by the Nigerian courts to annul the award. Shell is essentially an investor in in Exxon's original investment. Shell bought part of the investment after Exxon had entered into the contract with Nigeria, which is why you can treat it as though it were a single party. Yes, your honor. Can I ask a question about the. Oh, go ahead. Go ahead. Go ahead, Judge Kofner. I just want to ask about the portion of the arbitration award that the Nigerian courts reinstated. So and that you're asking be affirmed here. So let's I mean, I take it that that portion of the arbitration award pertains to who filed the tax returns and to the allocation of oil going forward. So let's say that that award is affirmed and you have the judgment already of the Nigerian courts. Can you take that and get an injunction on a going forward basis about how how oil is taken, taken out on a forward looking basis? Or what can you do with that judgment? Well, your honor, the judgment we have is effectively an injunction arising from the reinstatement of the arbitration award. That that NBC must stop overlifting or oil or forcing us to provide them more oil than that is provided by the contract. But they have ignored that that order ever since the award was issued. So that's going on. That's almost 10 years now. So they the orders have no effect whatever on on NBC. They haven't sought a state. They simply ignored the reinstatement of the arbitral award. And if we keep going back to court to try to to to enforce our contract. Right. I think the best we're going to we're going to do is we'll we'll we'll win an arbitration and then we'll take our arbitration award. And we'll be right back where we started. We have adjudicated contract breach, adjudicated damages and no ability to recover, recover those damages, which we submit under U.S. law. So quite apart from Nigeria, under U.S. law, under U.S. standards of justice is repugnant to the fundamental notions that we regard as just and decent. What's what's the basis for saying that if you went to the Nigerian courts and said, we have a judgment of your court that requires that provides this overlifting, yet this overlifting is occurring? What's your basis for saying you would get no relief from the Nigerian courts? Well, two two parts to the answer. First, we've we've already got that that order in place. We have that injunction essentially in Nigeria's NNPC rather has ignored it. And two, we believe all of the evidence that we submitted in the district court and is described in brief in our briefs establishes that we are not going to get a fair hearing in Nigeria. There is no opportunity for meaningful hearing in Nigeria because of the because of the importance of NNPC, which is which provides 70 percent of the country's revenues. And and the fact that courts don't rule against Nigeria NNPC when it comes to requests for money damages. They've had, I think, 50. No, I don't have a specific candidate, but somewhere in the vicinity of of 50 to 80 cases in the past 20 years against any defendants, whether of any regardless of. Of nationality in which they have they have lost a total of seven hundred and eighty thousand dollars over 20 years. So their their exposure from a litigation perspective before the Nigerian court is about fifty thousand dollars a year. I mean, can you respond to the cases that are in the first brief? Because I took there'd be a number of cases that they cite involving somewhat substantial relief that companies have obtained that were obtained against NNPC. Yes, your honor. In all three of those cases, the Nigerian courts did not order money damages from NNPC. There's only three NNPC cases that that first site in one related to the specific performance for for the delivery of oil. And the court, the court reversed the award of damages and simply left in place the order that the oil be delivered. We don't know if NNPC ever applied or not. In another one of the other cases, there was no money damages ordered. And in the third, NNPC did not pay any money damages for many years until ordered by, I believe, a French court to pay money damages. But again, the Nigerian court did not enforce an award for damages. So there are cases that the best they can do and they have access to everything in Nigeria. It seems to me that makes it that powerfully supports our point that we can't get a fair shake in the Nigerian courts. I'm sorry. Can I ask before? Let me just ask a quick question. Just quickly, what is the status of your action before the Nigerian tax tribunal and the appeal of the substantive action to the Nigerian court of appeal? You have actions pending in Nigeria, right? We do, Your Honor. We have. And it's very important that we have we have the dispute pending before the tax tribunal, because that's where tax disputes between the government and taxpayers are heard, not in not an arbitration. We didn't try to get our tax liability decided in arbitration. That was just our contractual right to decide how much oil that NNPC got. So that the tax part, the actual tax dispute has been in litigation for approximately 10 years. The NNPC has taken the position quite cynically that there's no jurisdiction even in the tax court to hear our tax dispute. But that's been up and down. They also took the position that the tax tribunal was unconstitutional. And what about the appeal of the substantive action to the Nigerian court of appeal? The substantive action is now on appeal to the Supreme Court of Nigeria. Supreme Court. OK. And that has not been heard yet. There's no there's no date for argument. That could be a long time, basically, you know, years. Doesn't dependency of those actions make your circumstances really quite different from those of the parties in PEMEX, where legislation had been passed retroactively to close the doors to all the courthouses and methods of judicial relief in Mexico, where things are still open and you're saying that probably, you know what the result is going to be. You will lose. But all that hasn't happened yet. It hasn't, Your Honor. Analysis. No, you're right. It hasn't, Your Honor. We we did try to bring a separate action as as directed by the high court of Nigeria in the courts directly to recover damages. And that was thrown out as an abusive process. The the evidence, though, is is very strong that there is just no basis for believing that we will get a fair hearing with respect to damages from any court in Nigeria. I appreciate that. That is a that is a significant assertion to make. But the evidence from the U.S. State Department, the U.N., from practitioners and professors in Nigeria, and even, as I mentioned, from from an NPC, his own expert in this case, although not in the declaration he filed and other statements he's made in Nigeria. We are just not going to we're not going to get a fair opportunity to be heard. We will have no meaningful chance for success on the issue of damages. Judge Stack, one last question before you turn the floor over. Yes, I agree. I agree. Absolutely. The last question. I just thought I heard counsel refer to an award of damages by a court, but not the ability to but without having the ability to collect those damages. And is that that I hear that? No, you are. The court ordered the Nigerian Court of Appeal ordered that our the liability portion of the arbitration award be reinstated. But because it said the payment of damages would be, quote, in essence, close quote, I'm just wondering, I'm just wondering whether an amount that portion, whether an amount of a dollar amount can be placed on that, on that portion that they're talking about or is that what you said before? You could not divide. No, I can divide one point five billion for four of what was allocated for tax oil. Yeah. Which, again, not not taxes that tax oil and three hundred million of that judgment. That was for not not for whether or for oil that had no connection, whatever it is. OK, thank you. Very good. Thank you so much. We will now hear from Miss Moss and Miss Moss, please feel free to take your time. Good morning. Good morning, Your Honor. May it please the court. Cecilia Moss on behalf of the Pele Cross Appellant Nigerian National Petroleum Corporation. We spent a lot. We spent a lot of time with my adversary talking about the merits. And considering that this case was pending in the district court for four years, it's understandable that that court was keen to dispose of it on the merits rather than on threshold procedural requirements. And the district court's decision on the merits was thorough and well-reasoned. But in reaching the merits, the district court failed to apply the clear requirements of Second Circuit precedent to two threshold issues. First, on foreign nonconvenience, Nigeria's compelling interest in interpreting and applying its own laws concerning the assessment of taxes and the resolution of tax disputes is indistinguishable from Peru's interest in applying the cap statute that was at issue in this court's decision in Figueredo v. Peru. While the district court recognized that Nigeria is an adequate alternative forum, it abused its discretion when it ignored Figueredo's directive that when litigation requires interpretation of a foreign law intimately involved with a sovereign prerogative, the public interest factor of ascertaining the meaning of another jurisdiction's law from the only tribunal empowered to speak definitively on it tips the balance decisively in favor of dismissal on forum non grounds. The district court also failed to follow the clear requirements of both Supreme Court and Second Circuit precedent on personal jurisdiction. On alter ego, the district court disregarded the holdings of the Supreme Court in Bonchek and this court in EM that the threshold for overcoming the strong presumption of separate status and finding a government instrumentality to be the alter ego of its sovereign owner is significant and repeated control of day-to-day operations. No evidence in the record supports such a finding and the district court didn't even make one. MNPC is a diversified independent modern oil company that operates multiple business units and incorporated subsidiaries under independent professional management. Rather than apply the mandatory day-to-day control test, the district court relied on scattered connections between the government and MNPC and on its conclusions that the government influenced MNPC's decision with respect to the issues in dispute here. The record chronology doesn't support the court's factual finding on influence, but even if it were factually correct, influence is not the test. The alter ego findings should be reversed. And the district court's finding of specific jurisdiction based on minimum contacts is irreconcilable with the Supreme Court's analysis in Burger King. The district court relied on one or two early pre-marketing visits that Nigeria or MNPC made to the United States and several other contacts that were incidental to the contract but unrelated to the dispute to support its minimum contact findings. Burger King makes clear that that kind of random, fortuitous, or attenuated contact cannot support personal jurisdiction. Next question about the appeal and the cross appeal. So your friend on the other side says this is not a properly presented cross appeal because you're not aggrieved by the decision below. And then in your reply, I'm not sure you disagree with the aggrieved principle in general, but you seem to say you can reach this ground as I think it's kind of an alternative basis for affirming, or tell me what you think the basis for reaching these grounds would be. Are you aggrieved by the decision below? And if you're not, what's the basis for deciding these issues? Sure. So I think looking at the Great American Audio Corporation case from the Second Circuit, it's clear that even if you're not quote unquote aggrieved, the circuit court can affirm the district court's decision on any basis submitted to the court and supported by the record. So even if we weren't considered to be aggrieved, there is a basis to affirm the district court's decision either on forum nonconvenience or on personal jurisdiction. Okay. But can I just ask, if I'm right about, if that's what the theory is, that it's an alternate ground for affirming the decision below, then I'm not sure I agree with you about the order of operations here. Then I don't think it's the case that one needs to look first to forum nonconvenience or to personal jurisdiction. Am I right about that? So I think under the Supreme Court's decision in Sinochem, if I'm pronouncing that correctly, you may look at forum nonconvenience before personal jurisdiction, but you have to find jurisdiction in order to reach the merit. The district court had to find personal jurisdiction in order to reach the merits. But if you're just offering an alternative ground for affirming the judgment below, is there a case law suggesting we have to reach an alternative ground for affirming rather than considering the ground relied on by the district court? I don't think you have to find an alternative ground, but NNPC has taken careful steps to avoid the expense and distraction of being hailed into court in the United States, and it did not want to let an incorrect ruling on jurisdiction haunted in future cases, and that's the reason for the cross-appeal. Sorry, did I interrupt you? No, sorry. And given the fact that if we didn't cross-appeal, we feared there was a chance we would have been viewed to have waived our objection to that, we thought it important to cross-appeal on those two bases, particularly when the district court ignored these specific directives of the Second Circuit and the Supreme Court case. So going back to the Burger King analysis, both the very purpose of this business transaction and every fact relevant to this dispute relate exclusively to Nigeria. The contract was negotiated and executed in Nigeria between Nigerian parties. NNPC required its contractual counterparties to incorporate in Nigeria, and the subject matter of the contract is exploration and production of oil in Nigeria and the dispute related to the allocation of the oil listed in Nigeria and to the payment of taxes there. And disputes under the contract were to be resolved not only under Nigerian substantive law, but the arbitration was governed by the Nigerian Arbitration Act and was seated in Nigeria. I suppose, let me ask you this, I suppose if we agreed with your adversary about PMAX and were about to send the case back down to the district court for further proceedings on that basis, but at the same time form non-convenience should have been decided in your favor, you would become aggrieved to have to go through continued perhaps many, many months of further litigation only then to have us reach your arguments about the jurisdiction and form non-convenience. So if we were of a mind to remand the case on the issue of PMAX and the PMAX rule, then we probably arguably ought to decide the jurisdiction and form non-convenience questions before doing that. Yes, Your Honor, I think that's correct. We certainly would be aggrieved and given how contentious the personal jurisdiction discovery and how lengthy that process was, the notion that, I mean, I didn't hear an answer from my adversary as to what the discovery is on the merits that Esso and Shell actually want. But I imagine that that process would be lengthy. And that is exactly the type of expense and distraction that NNPC has sought to avoid by not establishing any presence in the United States. Your adversary did specifically mention one thing that I remember sitting here, and that is the cross-examination of the expert witness. Well, I think, I mean, in going to that point, Your Honor, I think that there is clear support for the notion that the district court's decision to resolve this summary proceeding on the lengthy declaration submitted by both sides was appropriate. But if this court were to... I'm sorry, can I just ask you about that? Because, I mean, your friend on the other side said, basically, we should have gotten discovery because we were all litigating on the understanding that all we had to do was make that a primary session case, and then there would be discovery. So I take it that you don't agree with that. Can you point me to something in the record? Or what should I look to to sort that out, whether the parties were or were not working from the understanding that they would get the opportunity to do discovery and make further submissions? So I don't think that it was understood or accepted that there would necessarily be ongoing merits discovery. I think both parties and their sophisticated counsel recognize that a petition to confirm an award is a summary proceeding and that the rules of civil procedure don't apply. And I think that, I mean, one point of evidence on that aspect, Your Honor, is that petitioners specifically asked the district court to affirm the award. So it wasn't as though, in response, excuse me, in response to our motion. So it wasn't as though they were saying there that you should dismiss and grant us discovery. They said, excuse me, that you should deny our motion to dismiss and grant discovery. They said you should deny our motion to dismiss and affirm the award. So they clearly recognized that this was a summary proceeding, similar to all the other summary proceedings relating to the confirmation or not of arbitral awards. Yes, Judge Carney. I'd like to turn back to the meaning and effect of the Nigerian court's decision on the arbitral award. And I wondered if you agree that the correct reading of the Nigerian Court of Appeal decision in both the set-aside appeal and the FIRS appeal is that it was refusing to enforce the parts of the award that were on tax oil but not on cost oil, royalty oil, or the division of profit oil between ESO and NNPC and other contractual matters, which it suggested were severable and awardable. Do you dispute that understanding? Yes, Your Honor. I think that if you look at the Nigerian Court of Appeals award at page A687 of the record, the Nigerian Court of Appeals specifically said that the trial court acted rightly in setting aside the arbitral award, particularly to the extent of the tax aspect of it, especially the sum of U.S. $1.7 billion. But then I'm looking at A703 with a concurring justice saying he is in total agreement with reasoning as inclusion. And he says, however, as some of the reliefs claimed were based on the contractual agreement between the contending parties, those are severable and awardable by the arbitral tribunal. And frankly, I wasn't entirely sure how to read a concurrence in connection with this because each of the statements was somewhat less than categorical. Yeah, well, I think there are two places to look on that, Your Honor. So if you look back at A686, which is the main opinion of the Court of Appeals on the set-aside, the justice there says that the statement of claim goes to the volume of taxed oil listed. And with respect to the relationship between taxed oil, royalty oil, and cost oil, he said, if the former is increased, the latter is reduced and vice versa. In plain terms, the amount of the Petroleum Profit Tax Act payable was at stake at the arbitral tribunal. We don't have to do a micro-analysis of the text. I just take it that you do not agree that these are not severable portions, in your view, of the Court of Appeals decision. Is that right? Yes, Your Honor. Yes, Your Honor. And I think one point is important here, which goes back to your prior question on the concurrence. What the Court of Appeals was saying was that the prospective relief that it was granting, so directing NMPC to comply with the obligations with respect to further tax returns and further actions in the IRHA field, those are the ones that I think all three justices of the Court of Appeals agreed could be severable. So that prospective, call it injunctive, relief. But with respect to the amount of the award, I think it's quite clear on A687 that the Court of Appeals is saying that it is affirming the set-aside of that damages award in total. In total. Let me ask about the piece that remains in place. Your friends on the other side say the district court should have at least affirmed that piece of the arbitral award, and I didn't see an argument against that in your brief. Do you agree on that point? I don't think there's anything to affirm there as the Court of Appeals says that it's affirming the setting-aside of the damages award. So the only thing to confirm would be this prospective relief. So it isn't a damages award. I'm not sure what the purpose of that would be, Your Honor. Well, I mean, I take it the Court of Appeals, I mean, both sides' briefs say the Court of Appeals reinstates portions of the arbitral award, just not the damages portions. Why shouldn't those be confirmed? Well, I think that there, I mean, I guess I think that there would be no damages attached to that, and I'm not sure Petitioner has permanently asked for confirmation of the prospective relief, but the point from our perspective is that there is no damages award to confirm. Are there ongoing relationships between the parties as to which the Declaration of Rights and Obligations bears? Yes, the parties continue to withdraw from the URHA field. I mean, I'm not close to that, but there is an ongoing relationship between the parties, and NNPC does not dispute that the Nigerian Court of Appeals didn't, I mean, excuse me, the Nigerian Court of Appeals set aside was specifically focused on the $1.7 billion damages award. Is there any bar, then, to confirming the part of the court's order that the parties, or that all three justices agreed on was the Declaration of Rights and Obligations? I don't think that's what my adversary has asked for. I think what my adversary has asked for is a confirmation of the damages award, or for some confirmation of the award that then would lead to the district court using its discretion to imply damages, and the implication of damages tied to that prospective relief would be directly contrary to the decision of the Nigerian Court of Appeals. I think if this court were to reach the merits, Petitioner's Appeal fails because they are asking U.S. federal courts to sit as the ultimate courts of appeal to review the decisions of the Nigerian courts on this specialized issue of Nigerian law. In denying Petitioner's Claim that they have not received due process in Nigeria, the district court found that the Nigerian court conducted a fulsome analysis to determine whether tax disputes were arbitrable, and whether the dispute at bar was a tax dispute. They don't identify any specific denial of due process or procedural irregularity in this case. Instead, they're asking this court to rule that the courts of Nigeria are not capable of applying their own law. But their ongoing conduct defeats their complaint of a denial of due process because they continue to pursue three separate ongoing proceedings in Nigeria. And while they invoke PEMEX, the only federal court decision to confirm an award vacated at the seat of the arbitration, the PEMEX comedy analysis does not consider a party's dissatisfaction with a foreign court's interpretation of its own law. As your honors recognized earlier, the PEMEX standard is extremely narrow, and it requires federal courts to defer to the decision of foreign courts interpreting their own law unless a ruling is shown to be repugnant to fundamental notions of what is decent and just in this country. The entire thrust of Petitioner's case to the district court was an effort to shoehorn the facts of this case into the factors this court expressly addressed in PEMEX. That's what lawyers do, isn't it? They try to take facts of this case and say it meets the criteria set forth in that decision. The problem is that it seems to me that you have this remarkably general rule that's been adopted by our court. I have nothing against it, but this fundamental notions of what is decent and just is not exactly detailed. You leave it to the courts to have to shoehorn perhaps, but have to explain why in the case before them it either does or doesn't meet that very general standard. Exactly, your honor. While they made the attempt to shoehorn their case into the facts, they criticized the district court's opinion for focusing on what they've called the PEMEX factors. But the reality is that the district court's opinion simply tracks Petitioner's own arguments and rebutted them in turn. But it's important to note the district court didn't simply check the PEMEX boxes. It recognized that PEMEX required it to determine whether the Nigerian court decisions offend notions of justice from the point of view of the United States. The district court fully supported its conclusion that the Nigerian court holdings do not offend basic standards of justice from the point of view of the United States with its recognition that the Nigerian Court of Appeal applied relevant statutes and case law. Its holdings were supported by the Nigerian court's interpretations of Nigerian law. And its conclusion that the Nigerian Court of Appeal conducted a fulsome analysis to determine whether tax disputes were arbitrable and whether the dispute at bar was a tax dispute. So necessarily, the district court explained that petitioners were asking him to review the Nigerian court's interpretation of Nigerian law or the sufficiency of its precedent. The district court refused to do that. Instead, it followed this court's clear instruction in PEMEX that U.S. courts, quote, are in no position to pass upon a foreign court's interpretation of foreign law or upon the sufficiency of its precedent. But even if you buy into their PEMEX factors argument, this case is in PEMEX and the district court correctly distinguished PEMEX on its facts. NNPC maintained from the outset that this was a non-arbitrable tax dispute. The Nigerian rulings applied longstanding Nigerian statutory law on the non-arbitrability of tax disputes. And neither petitioners nor their experts even argue that there was ever a change in Nigerian law concerning the arbitrability of tax disputes. And importantly, and I think I mentioned this before, but petitioners' access to the Nigerian court system is not blocked. They claim every door is shut, but they received partial relief from the Nigerian court of appeal and they continue to pursue their case in free access proceedings. What was that relief? I'm having trouble throughout this argument understanding what that relief that they received was. What did they in fact get from the Nigerian court? The injunction? Yes, Your Honor. So essentially, prospective relief directing NNPC to file tax returns in accordance with the way they're prepared by SO and SHEL and not to lift oil in a way that doesn't fit with the allocation submitted by SO and SHEL pursuant to the terms of the contract. The distinction the court of appeal made was that to the extent that petitioners claimed that NNPC's tax calculations were incorrect and the tax returns that NNPC filed were incorrect, the Nigerian court of appeal and then NNPC paid the taxes, right? So the Nigerian court of appeals position is that's seeking a return of taxes paid and that's a tax issue that needs to be resolved, that cannot be resolved in arbitration. So the award of the damages was improperly resolved in arbitration and belongs in the Nigerian court system or before the Nigerian tax appeal tribunal. Is there anything you'd like to say just kind of wrapping up? You just have a couple minutes left. Oh, sure. Yes, Your Honor. So I think the decisive distinction between this case and PEMEX is that PEMEX did not require any substantive review of the Mexican court's legal findings. It hinged on legislative intervention that put this case procedurally beyond the pale, that put that case procedurally beyond the pale. So should you reach the merits, the key point is that the ultimate arbiter of Nigerian law affecting the resolution of tax disputes should be the Nigerian Supreme Court and not United States court. Thank you. Very good. Mr. Marcu, you have several minutes for rebuttal. Thank you, Your Honor. There are several points that I would like to make. I think first with respect to just briefly with respect to jurisdiction, the district court made multiple factual findings with respect to both the minimum contacts finding the court made and the alter ego analysis. And I think in none of those factual determinations have been genuinely attacked by NNPC here, just the application. I submit that with respect to both alter ego where there is substantial evidence of control of powerful control and the fact that the president of Nigeria ordered the breach of contract in the first place that brings us here. And it had no commercial purpose for NNPC because all of the extra oil it extorted from us, it handed over to the government. That and all the other items of areas of control that we lay out in our briefs, I think clearly established the EM factors and satisfied bond check. Secondly, the minimum contacts, I don't think I'll even address in the interest of time. We covered that very well, I think, in our brief. And in a case here where NNPC came specifically to the U.S. to get Exxon to invest because of Exxon's expertise in being able to explore and to produce oil from two miles under the ocean floor, under the ocean surface rather. And to get the capital from Exxon, which funded the entire exploration process and invested $6 billion before a drop of oil was produced. They clearly availed themselves of the privilege of doing business here for the purpose of developing their oil field. And then on the back end, they send billions and billions of dollars of proceeds for the sale of oil, including sales from our oil field, the air and oil field, to JPMorgan Chase accounts in New York, which they control. Again, I will then rely on my brief for the balance. With respect to foreign nonconvenience, I think that my friend mistakes the meaning of figurative where there was a sovereign prerogative that the court identified. The reason that kept the balance in figurative is because there was nothing on the other side. There were no contacts with the United States except the possibility of attaching a bond offering by Peru. There was a perfectly good forum in Peru. In fact, that forum rejected Peru's effort to – the Peruvian court rejected Peru's effort to get the arbitration award annulled. And Peru was paying the judgment. It simply was paying it in installments because of its cap statute it had. But there was nothing else to counterbalance the existence of that – the prerogative of figuring out how its cap statute worked because there were no contacts in the United States. And critically, we do not have a forum in Nigeria, and that is at the heart of our merits case, which I submit the court really would need to decide in order to reach the conclusion that there is a forum from a foreign nonconvenience perspective that we can go to in Nigeria, which, of course, we did not. So I'd like to turn then to – back to the merits. Why don't you take two more minutes? Okay. Thank you, Your Honor. First, we did, in fact, ask the court to affirm the portion of the arbitral award that was reinstated by the Nigerian Court of Appeal. And, in fact, we pointed out that NNBC did not oppose that request for release. We did then want the court to use its inherent power as an alternative to enforcing our award to award damages. But we certainly did ask for that release. I think it – the – Judge Sack came back to the issue of what we get if we get that enforced. And, frankly, Your Honor, without the exercise of inherent authority to award us the damages that were determined by the arbitration panel, I think you are right not much. Your implication is right not much because NNBC has demonstrated by ignoring the order for the following 10 years and continuing to force us to overlook oil for it that that would be an asset of no value in Nigerian courts. We are continuing – I'm sorry. I'm sorry. You're saying that for 10 years they have – or for some period of time they have failed to enforce that prospective relief? They have failed to – NNBC has failed to comply with the order of the Nigerian Court of Appeal. Yes, Your Honor. And, again, the Nigerian Court of Appeal simply swept aside all of our damages, including ones that had nothing to do with taxes, because, as we say, not because we want this court to sit as a super court of appeal over the Nigerian court system. We want this court to appreciate that it was an irregular decision. In fact, there was no precedent for it, and none has ever been cited. So I don't know what my friend was referring to. None was cited that supported the proposition that contractual disputes, even ones that in some fashion relate to how much would be paid in taxes, were not disputes that were arbitrable under Nigerian law. And, in fact, the Nigerian Court of Appeal – Mr. Buckley, you need to wrap up. You need to wrap up, please. My apologies, Your Honor. Thank you. I appreciate the warning. So what we are asking this court to do is to find that the result of the Nigerian court decision, which is that our very significant contract breaches caused us significant damage, but we are denied any remedy, any damages payment in Nigeria. That is inconsistent with or repugnant to the fundamental notions of justice. And I appreciate, Judge Sack, your reference to the standard. It comes from Ackerman, which is, you know, from several years before. Mr. Marcoux, you need to finish. Thanks, Your Honor. Last words. My last words is that repugnancy means that it undermines confidence in the administration of the law and the security of private property rights, and that certainly is what has happened to Exxon and Shell here. Thank you, Your Honor. Thank you very much. Thank you very much. Ms. Moss, you have still a bottle of five minutes. Thank you, Your Honor. I think I have five points to make. So I think that Mr. Marcoux started talking about findings of control with respect to the alter ego issue, but the record doesn't reflect control. The district court focused its analysis on influence, not control. And as you look at the controlling cases, they talk about repeated and excessive control over day-to-day operations. There was no repeated and excessive control over day-to-day operations here. And I think even in the case that they have focused on the most throughout this litigation, the McKesson case, which by the way is a D.C. Circuit case, but in that case there were findings that the government had forced the PAC dairy to disregard its commercial mission and forced the dairy to disregard its duties to its shareholders. So it wasn't influence that was at issue in McKesson. It was directives or force. And there is no evidence of such control here. With respect to the issue of his assertion that NNPC had no interest in its actions in ensuring that it was collecting the correct amount of tax oil and filing accurate tax returns, the contract requires that NNPC file the tax returns on behalf of both itself as NNPC and the contractors, ESO and Shell. And so its interest was ensuring that it was filing accurate tax returns and paying accurate taxes. Its position was it didn't want to violate the law in not filing accurate tax returns. With respect to ESO's investment in Nigeria and the suggestions that because ESO invested so much money in Nigeria and NNPC sought ESO's investment in Nigeria, that is not a basis for minimum contact. ESO's actions are not a basis for minimum contact. It's NNPC's actions. And by having one private meeting in Houston and several phone calls, that's not minimum contact. The record is clear that the key provisions of the production sharing contract were negotiated in Nigeria. And Mr. Turner's declaration is very clear on that, on page A940. He speaks about his meetings in Lagos. With respect to his suggestion that payment of oil to bank accounts owned by the Nigerian government are a basis for minimum contact, it's important to recognize that the production sharing contract has nothing to do with the sale of oil. It's a contract about exploration and production of oil in Nigeria and the allocation of that oil between the parties. So the sale of oil has nothing to do with the contract, and it certainly has nothing to do with this dispute. On his point about NNPC's alleged contact with the United States serving as a counterbalance in the Figueredo analysis, first of all, I don't think that's a correct analysis. I think contacts apply to personal jurisdiction. But here, I mean, if you're doing a private interest versus public interest balancing, the private interest factors here unquestionably favor Nigeria. If there were to be some sort of future trial, all the evidence and witnesses are in Nigeria. As Judge Sack mentioned, the one thing they'd ask for is to cross-examine our Nigerian expert. He's in Nigeria. And I think finally, Mr. Marku acknowledged that the only reason they're asking for a confirmation of the prospective relief is so that the U.S. court can then use some form of inherent authority to award the very relief that the Nigerian court has said is not available because it is seeking a refund of taxes. So to do that, to use the inherent power, would be the same as to deny comity to the Nigerian court of appeal, which is not justified under PEMEC. Thank you. Thank you very much. Thank you. Thank you both. Very, very well argued and a long and interesting argument. We will reserve decisions.